## AMERICAN ARBITRATION ASSOCIATION

AAA CASE NO.  32  199 00799 02

---

GRANT/SEEBECK INTERNATIONAL, LLC,

      Claimant,

v.

FIRST DATA MERCHANT SERVICES CORPORATION,
FIRST DATA CORPORATION,
CHASE MERCHANT SERVICES, LLC, and
J.P. MORGAN CHASE & CO.,

      Respondents.

Date Rec'd 12-16-13
Rec'd by   Em
Date Due
Docket by
Docket Chk
Routed to   SHS

File in
Filed by   1   2   3   4
84-7

---

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER having come on for hearing before the Panel on November 14-18, 2005 and on January 3-4, 2006 for the initial phase of these bifurcated proceedings, and on March 4-8, 2013 and June 24-27, 2013 for Final Hearing between the remaining parties, Claimant Grant/Seebeck International, LLC ("GSI" or "Claimant") and Respondent First Data Merchant Services Corporation ("FDMS" or Respondent") f/n/a National Bankcard Corporation ("NaBANCO"), and the Panel having considered the evidence presented, together with the parties' written summations, and the parties having agreed that "[t]he Panel shall provide written Findings of Fact and Conclusions of Law…," (Pre-Trial Order at 4. ¶ 18.), and the Panel otherwise being fully informed, the Panel issues its Findings of Fact and Conclusions of Law (collectively "Findings and Conclusions") as follows:

## FINDINGS OF FACT

### The NaBANCO GSI Relationship Begins

NaBANCO provided (and as FDMS continues to provide) authorization, processing, and settlement services for third-party credit and debit card transactions. For many years prior to 1995, NaBANCO marketed and sold its credit and debit card processing services directly to merchants. In the mid-1990's, NaBANCO sought to expand its traditional services to take advantage of potential e-commerce opportunities resulting from the emerging internet.

Robert Buoniconti ("Buoniconti") served as executive vice-president of sales for NaBANCO's card-not-present division (2005-2006 Hearing Tr. at 708:1-18) – one of three NaBANCO sales divisions located in Florida. *Id.* at 498:25 – 499:2, 681:9-14 and 2013 Hearing Tr. at 1649:13-20. He reported to NaBANCO's president and CEO, Paul Garcia ("Garcia"). 2013 Hearing Tr., *supra* at 1747:15-17. Buoniconti's responsibilities included "…embrac[ing] a business philosophy as it related to the internet." 2005-2006 Hearing Tr., *supra* at 743:2-3.

GSI consisted of William Seebeck ("Seebeck") and Hunter Grant ("Grant"). *Id.* at 239:2-9. Buoniconti met Seebeck in 1993. *Id.* at 75:1 - 76:13. Being satisfied that Seebeck was an expert in the emerging e-commerce market (*id.* at 946:3-12 and 1102:5), Buoniconti believed that Seebeck and Grant could educate NaBANCO about e-commerce and provide opportunities for NaBANCO to participate in e-commerce business. *See, e.g., id.* at 1102:10-11.

### The Verbal Agreement

In 1994 the parties verbally agreed to work together toward achieving NaBANCO's e-commerce business goals. *Id.* at 84:5-20 and 714:6-14. Negotiations

between the parties and their respective counsel for a written contract began and continued for over a year.  *See* Ex. 4.

According to Buoniconti, GSI was to "...create the interest, the buzz about taking their [*i.e.* NaBANCO's] business model and applying it toward the internet."  2005-2006 Hearing Tr., *supra* at 834:23-25.  GSI "brought ideas…[w]e were selling an idea, a concept."  *Id.* at 858:22 and 859:17-18.  The idea was the ability to instantaneously transact online what previously had been done manually through point of sale, mail or by telephone.  *Id.* at 1344:4-11.

Buoniconti believed that GSI was going to position NaBANCO as a leader in the internet processing arena and that "...[t]his was a long term play."  *Id.* at 749:16-22. GSI's "...primary goal was [to] bring us into the merchant."  *Id.* at 831:9-10.  GSI's "...responsibility was to be the entrée into the merchant on our behalf and to help us, from a technical perspective…sign the deal."  *Id.* at 1145:8-10.  "[O]nce that was accomplished, [NaBANCO] would provide resources to go to contract with the merchant" (*id.* at 1145:11-13) and to "...successfully close this business."  *Id.* at 823:1-4

**The First Microsoft Contract**

In March, 1994 NaBANCO received a request for proposal ("RFP") from the Microsoft Corporation ("Microsoft").  *Id.* at 95:12-24.  The RFP required the ability to instantaneously perform credit card processing, globally settling in nineteen currencies utilizing the internet.  *Id.* at 96:1-5.  NaBANCO requested GSI's assistance in responding to this RFP because this was "...up [GSI's] alley." *Id.* at 99:7-12.

GSI and NaBANCO succeeded in satisfying Microsoft of NaBANCO's ability to fulfill the RFP requirements and NaBANCO was awarded the Microsoft contract in August, 1994.  *See* Ex. 50.  GSI and NaBANCO continued to work together to determine

the requisite "methodology" (2005-2006 Hearing Tr., *supra* at 90:23-24.), understand the "record format" (*id.* at 865:15-20), and identify the software modifications to NaBANCO's processing system necessary to accommodate Microsoft's e-commerce requirements. *Id.* at 410:22-23 and 865:7-25. The first Microsoft contract was finalized sometime in May, 1995 (*id.* at 120:15 – 121:5) but was back-dated to January 25, 1995. *Id.* at 121:12-17 and Ex. 1 at 22.

Buoniconti considered the Microsoft contract to be a "home run" for NaBANCO. 2005-2006 Hearing Tr., *supra* at 752:7-8. This new e-commerce business solution for Microsoft was at times referred to by Buoniconti as the "Grant/Seebeck Solution," (*see, e.g., id.* at 730:23-24) or the "Microsoft [S]olution." *See, e.g., id.* at 1241:21. Buoniconti anticipated that NaBANCO eventually could; (i) utilize this Microsoft Solution to obtain e-commerce card processing business from other merchant prospects (*id.* at 974:2-22), and (ii) utilize the now established Microsoft relationship to explore additional e-commerce opportunities with Microsoft. *Id.* at 1158:8-13.

The first Microsoft contract was amended ("Microsoft Amendment") in June, 2000 (Ex. 119) extending the term of the first Microsoft contract through June, 2002. *Id.*

**The Marketing Agreement**

With the first Microsoft contract assured, GSI and NaBANCO continued to negotiate their written contract to govern their business relationship, including compensation due GSI from the Microsoft contract. GSI and NaBANCO ultimately executed two written agreements; (i) the five-year Marketing Agreement (Ex. 1, *supra*), and (ii) the Consulting Agreement. Ex. 2. Although dated January 1, 1995 these Agreements between NaBANCO and GSI were not fully negotiated or signed until May, 1995. 2005-2006 Hearing Tr., *supra* at 111:3-5.

The Consulting Agreement governed GSI's sale of its e-commerce intellectual property rights to NaBANCO. Ex. 2, *supra*. GSI was paid over $300,000.00 under the Consulting Agreement (*see id.* at 2), and GSI does not claim a breach of this agreement. 2005-2006 Hearing Tr., *supra* at 1494:4-6. The Marketing Agreement governed the parties' respective marketing rights and obligations and the fees to which GSI would be entitled for successful sales of NaBANCO Service, defined as; (i) Traditional NaBANCO Processing Service, (ii) New NaBANCO Service, and (iii) other related New NaBANCO Service - denominated as "incremental business." Ex. 1, *supra* at 1 and 4.

New NaBANCO Service encompassed the potential new e-commerce business envisioned by NaBANCO (2005-2006 Hearing Tr., *supra* at 807:1-4) and defined in pertinent part as "…credit card authorization, processing and settlement service that will operate on the Global Information Superhighway and Global Commerce and other electronic medium." *Id.* at 1.

Under the Marketing Agreement, GSI agreed to market the New NaBANCO Service to thirty-four "Tier One Companies" as an independent contractor. Ex.1, *supra* at 1 and 8. Seebeck came up with the list of Tier One Company merchants attached to the Marketing Agreement. 2005-2006 Hearing Tr., *supra* at 752:14-17. NaBANCO agreed to pay GSI a fee for its Tier One Company marketing efforts and for other related New NaBANCO Service business opportunities offered to NaBANCO as a result of GSI's marketing efforts. Ex. 1, *supra* at 3-4.

GSI was granted the exclusive right to market the New NaBANCO Service and other related New NaBANCO Service to the Tier One Companies through December 31, 1996. 2005-2006 Hearing Tr., *supra* at 276:1 - 278:18. During the same period, it was precluded from offering its marketing services (*i.e.* "GSI Services") "… with respect to

credit and/or debit card authorization, processing and settlement services…" to anyone else within the United States. Ex. 1, *supra* at 2. GSI was permitted to market Traditional NaBANCO Processing Service as the parties might agree in writing. *Id.* at 1.

GSI's fee was calculated based upon a profit and loss model ultimately applying decreasing share percentages over time to the net profit NaBANCO achieved from processing for "Customers." *See id.* at 3, 4 and 9, and 2005-2006 Hearing Tr., *supra* at 548:1-16. (The net profit determination for purposes of the fee calculation was basically the same under the GSI Marketing Agreement as it was for the entire NaBANCO salesforce. 2005-2006 Hearing Tr., *supra* at 564:17-24.) "Customers" was defined in the Marketing Agreement as those who contracted with NaBANCO for the New NaBANCO Service as a result of GSI's marketing efforts. Ex. 1, *supra* at 2.

GSI had twelve months from execution of a merchant contract to declare a "Customer Commencement Date" which triggered NaBANCO's obligation to pay GSI fees. *Id.* at 3. Thereafter, GSI was entitled to fees for the longer of four years after the customer commencement date or the "… Customer's initial contract term." *Id.* The Marketing Agreement further provided that "[i]n the event that an agreement with a Customer is for a period of less than five years, any renewal of the New NaBANCO Service with such Customer shall be treated as part of the original agreement." *Id.*

Microsoft was among the merchants included within the list of Tier One Companies. *Id.* at 8. A copy of the first Microsoft contract was attached to the Marketing Agreement. *Id.* at National Bankcard Agreement, 1-24. Microsoft was expressly acknowledged by the parties to be a "Customer" that had contracted with NaBANCO for the New NaBANCO Service and for which GSI would be entitled to a fee. *Id.* at 2. Finally, NaBANCO agreed to; (i) use its "best efforts" to assist GSI in marketing to the

Tier One Companies at least through the December 31, 1996 exclusivity period (Ex. 1, *supra* at 2), and (ii) maintain accurate and complete records of GSI-related transactions during the five-year term of the Marketing Agreement and for a period of four years thereafter for audit purposes. *Id.* at 4.

NaBANCO's finance department employee, Roger Fielding ("Fielding"), was charged with the calculation of fees due GSI. 2005-2006 Hearing Tr., *supra* at 461:15-19. He was hired by NaBANCO in May, 1995 to compute commissions for NABANCO's National Sales Force, and to keep accounting records related to such commissions. *Id.* at 563:14-25. Fielding also was charged with NaBANCO's record maintenance obligation under the Marketing Agreement. *Id.* at 479:1-18.

GSI provided NaBANCO with its customer commencement date letter for Microsoft related fees to begin twelve months from the date of the public launch of the Microsoft Network - which was expected to occur sometime in the fourth quarter of 1995. Ex. 50. As the Microsoft business continued to grow after the December, 1996 exclusivity period, Buoniconti expressed concerns regarding the lack of GSI's involvement in obtaining certain of the Microsoft processing business, (including business from new entities formed within Microsoft), for purposes of acknowledging fees due to GSI. 2005-2006 Hearing Tr., *supra* at 1154:11-19 and *see* Ex. 113. Following discussions with Fielding about this issue, Buoniconti and Fielding agreed that GSI nevertheless should receive credit for all Microsoft processing activity. *Id.* at 1155:6-16, 1157:9-13 and 1196:10-19. According to Bouniconti, this was to be NaBANCO's policy for the entire term of the Marketing Agreement. *Id.* at 1157:16 – 1158:13 and 1196:16-25.

Buoniconti testified that as a result of GSI e-commerce business ideas, "[l]ater on we were way ahead of the curve … [w]e were far ahead of everybody else." *Id.* at 858:23-24. He understood that GSI would be entitled to a fee for "other type[s]" of New NaBANCO Service (*i.e.* incremental business) if a "…customer such as…Microsoft…came to NaBANCO in the first instance as a result of GSI Services." *Id.* at 777:1-13. Although Buoniconti assured Seebeck that GSI also would be informed of any incremental business from Microsoft and any other Tier One Company (*id.* at 840:22 - 841:8), GSI was never notified of any incremental business from Microsoft – or from any other company. *See id.*

**The Microsoft Conversations**

Notwithstanding the GSI exclusivity period provided in the Marketing Agreement, Buoniconti continued to have weekly conversations with Microsoft about potential new business opportunities (*id.* at 838:17 - 839:11), but he excluded GSI from most of these conversations. *Id.* at 840:1-11. During this same period, Buoniconti asked for and received from GSI a report dated June 19, 1995 on CheckFree Corporation ("CheckFree"), a company engaged in the e-commerce bill presentment and payment business. Ex. 63.

On June 25, 1995 Seebeck wrote to Buoniconti complaining about his exclusion from Buoniconti's conversations with Microsoft. Ex. 64. Seebeck's letter specifically referenced a meeting between Microsoft and Garcia. *Id.* Seebeck was assured by Buoniconti not to worry about his fees. As Buoniconti explained, "…we anticipated there would be additional activities being generated by Microsoft, and when that did occur, that we would absolutely process those transactions and that we would pay Mr. Seebeck for those transactions. 2005-2006 Hearing Tr., *supra* at 1158:7-13. Buoniconti's weekly

conversations with Microsoft continued, largely in GSI's absence, throughout Buoniconti's involvement in the NaBANCO/FDMS relationship with Microsoft. *Id.* at 838:17 – 840:11.

**The Merger**

Within weeks after the Marketing Agreement was signed, NaBANCO's major competitor, First Data Corporation ("FDC"), announced plans to merge with NaBANCO's parent company. *Id.* at 183:15-18. NaBANCO became a wholly owned subsidiary of FDC. *See, e.g.,* Exs. 351 and 354. FDC merged its wholly owned card-processing subsidiary, Card Establishment Services ("CES") into NaBANCO, and the NaBANCO/CES name was changed to FDMS in April, 1996. 2005-2006 Hearing Tr., *supra* at 1236:14-18.

Upon completion of the FDC merger with NaBANCO's parent in October, 1996 FDMS's business model changed. *See, e.g.,* Exs. 351 and 354, *supra.* Instead of marketing primarily to merchants, FDMS now followed FDC's business model of forming independent alliances with banks under which the banks marketed FDMS services to merchants. *See* The Alliances section, *infra* at 17.

In a June 25, 1996 letter, Seebeck complained of the adverse effect these mergers had on GSI's marketing and sales efforts. Ex. 77. He requested "…a strategy meeting with First Data's management in California where their operation is headquartered." *Id.* Seebeck's request for a "strategy meeting" was rejected by Buoniconti, and FDC'S counsel, Todd Morrison, Esq., responded to Seebeck on July 16, 1996 and, (without reference to a meeting with FDC), directed Seebeck back to Buoniconti "…to discuss any and all outstanding issues." Ex. 78.

Buoniconti determined that GSI's requested strategy meeting "…was not in the best interests of First Data Merchant Services." 2005-2006 Hearing Tr., *supra* at 755:19-22. He prohibited GSI from contacting anyone at FDC without his authorization. *Id.* at 759:8-16. By this time, Buoniconti's boss (Garcia) was reporting directly to the CEO of FDC's merchant business, Roger Pierce ("Pierce"). *See* Ex. 226, Gregg Gumbinger ("Gumbinger") Tr. at 16:5-18 and 18:5-6.

## The FDC E-Commerce Group

Prior to the merger, FDC had its own internet development division in California, including the Electronic Fund Services ("EFS") group. *Id.* at 15:8-18 and 22:19 – 23:3. Pierce's responsibilities as CEO of FDC's merchant business included this internet development division. *Id.* at 16:5-18. Scott Lofteness ("Lofteness") was president of the internet development division (*id.* at 15:8-10) and reported to Pierce. *Id.* at 14:21-23. Chuck White ("White") and Gumbinger worked for the EFS group. *Id.* at 14:3-25, 15:8-13 and 16:5-15. White reported to Lofteness – and Gumbinger to White. *Id.* at 14:20-25

Gumbinger testified that prior to 1995, FDC was known as First Data Resources ("FDR"). *Id.* at 8:11-14. According to Gumbinger, FDR processed transactions through the Omaha platform on behalf of both merchants and card holders. *See id.*

Although disputed by White, Gumbinger testified that prior to the merger he was actively marketing to certain of the Tier One Companies for a Netscape related internet processing service. *Id.* at 35:5-20, 48: 3-24, 50:5 - 51:21 and 54:17-23. These Tier One Companies included Lexis/Nexis, McGraw-Hill, MCI, News Corp., and Thompson Group Limited. *Id.* at 48:3-4, 50:13 - 51:21 and 54:17-23. Gumbinger believed that at least some of these companies purchased Netscape software and, either prior to or after the merger, did processing through FDC. *Id.* at 62:13 – 63:7.

An FDMS discovery response indicateded that some of the Tier One Companies, including MCI, processed through the Omaha platform. Ex. 327 at 16-19. Dispite the fact thatFDMS's expert witness, Michael Elkin ("Elkin"), explained that this response was incorrect (2013 Hearing Tr., *supra* at 1925:8 - 1926:19), the FDMS discovery response was neither withdrawn nor amended.

After the merger, Gumbinger became an employee of FDMS. Ex. 226, Gumbinger Tr., *supra* at 18:16-23. At some point in 1996 during GSI's exclusivity period, the EFS group was disbanded. 2005-2006 Hearing Tr., *supra* at 735:12-19. Buoniconti's group was designated the "sales arm to sell internet processing services," (Ex. 226, Gumbinger Tr., *supra* at 17:15-18) and from that point forward, Gumbinger "…got to work with [Buoniconti], probably every week." *Id.* at 19:16-17. Buoniconti disputed this (2005-2006 Hearing Tr., *supra* at 720:17-22) and characterized his conversations with Gumbinger as merely occasional. *Id.* at 724:6-16.

Buoniconti did acknowledge, however, that as of April 18, 1996 FDC operated CES, Envoy, and NaBANCO as a single business unit and "[t]hat was the formation of First Data [Merchant] Services." *Id.* at 1236:13-18. From that point on, the internet processing services group only sold the "Microsoft [S]olution." *Id.* at 1241:19 – 1242:15. The decision to stick with the Microsoft Solution was "discussed…at a senior level. *Id.* at 733:6-19.

In recognition of the exclusivity provisions in the Marketing Agreement, Respondents have stipulated that if the Panel determines that GSI is entitled to additional fees for processing performed for any Tier One Company other than Microsoft, then GSI would be entitled to fees generated by FDC (including Gumbinger's Netscape related

internet processing services, if any) with Tier One Companies first obtained post-merger, through December 31, 1996. *Id.* at 1542:5 - 1543:17.

Notwithstanding his working relationship with Buoniconti, Gumbinger testified that he was unaware that NaBANCO had developed an e-commerce card processing solution for Microsoft, and Buoniconti never mentioned GSI, Seebeck, or Grant to him. Ex. 226 Gumbinger Tr., *supra* at 40:7-15. Similarly, FDC's White knew Buoniconti from the merger, but claimed that he too had no recollection of FDMS's Microsoft e-commerce contract. 2013 Hearing Tr., *supra* at 1348:10-14

Buoniconti believes, and the Panel finds, that Buoniconti had a conversation with White and others at the EFS group regarding GSI "…because of the Microsoft connection, absolutely." 2005-2006 Hearing Tr., *supra* at 725:23-24. Indeed, Buoniconti recalled that when he told the members of the EFS group about what FDMS was doing with Microsoft "…they were kind of upset because we had established that [Microsoft] relationship…[t]hey were going down a different path with Netscape…[w]e told them we were working with Microsoft and were going to continue down that path utilizing GSI." *Id.* at 728:20 - 729:2.

According to Buoniconti, FDC's Lofteness also knew that GSI had a consulting agreement with FDMS, but Lofteness did not know the specifics. *Id.* at 917:16 - 919:14. Following the merger, Lofteness became known as the chief technology officer for the combined business. *Id.* at 860:9-12. Although Buoniconti testified that he did not fully understand what internet related matters FDC was working on in California, he nevertheless determined that involving GSI in FDC related business activities simply "…would complicate matters." *Id.* at 743:20-24.

Buoniconti understood that GSI would be entitled to fees from FDC under the Marketing Agreement "…if we had a contract with them and working for us and something would be given to Seebeck for his efforts." *Id.* at 879:3-10. However, Buoniconti believed that GSI's right to fees under the Marketing Agreement was limited under any circumstances to signing up customers to do their credit card processing for sales that originated over the internet. *Id.* at 1255:16-24.

**The Microsoft Meetings**

Following the merger, Buoniconti's continuing conversations with Microsoft included a meeting with Microsoft and FDC's Lofteness. *Id.* at 910:13-25. This meeting was arranged and attended by Buoniconti, but not by GSI. *Id.* at 860:8-20. Buoniconti "…wanted [Loftness] to see and interact with the Microsoft people to get a flavor [of where]… we were to go." *Id.* at 16-17.

Buoniconti also recalled a Microsoft meeting he arranged with NaBANCO/FDMS's president and CEO, Garcia, "…to bring significant value to the Microsoft relationship." *Id.* at 838:3-7. GSI was not included in this meeting.

Another meeting with Microsoft was arranged with FDC chairman and CEO, Henry Duques. It was held in mid-1996 to discuss a proposed joint venture between FDC and Microsoft to pursue e-commerce bill presentment and payment business. Ex. 226, Duques Tr., *supra* at 17:16-23, 19:3-7 and 23:4-8. GSI was not included in the meeting.

**The Microsoft Joint Venture**

Duques was unaware of any relationship between FDC and Microsoft prior to its merger with NaBANCO's parent. *Id.* at 23:15-21. However, at least by the time of his meeting with Microsoft in mid-1996, he was aware of the NaBANCO/FDMS "merchant services business" relationship with Microsoft. *Id.* at 116:1-7. Duques also recalled that

"[t]here was an intermediary" that facilitated his meeting with Microsoft regarding the proposed joint venture." *Id.* at 147:4.  He testified that "…someone in the FDMS division" was responsible for putting the Microsoft FDC joint venture relationship together.  *Id.* at 13:8-16.

Duques considered the proposed joint venture with Microsoft to be just "…another processing activity.  We are a processor.  We just process transactions.  So [e-commerce bill presentment and payment is] another opportunity for another processing transaction…" *Id.* at 105:8-12.  According to Duques, FDC already was "…creating bills for credit card issuers …but we didn't do it online [before the joint venture].  We did paper." *Id.* at 19:11-13.

By early 1996, FDC's White had shifted his focus from the EFT group to the development of FDC's e-commerce bill presentment and payment development business. 2013 Hearing Tr., *supra* at 1344:17 – 1345:2.  He understood that CheckFree would be a major competitor in this e-commerce endeavor.  *Id.* at 1377:15-21.  In early 1997, after Lofteness, Garcia, and Duques had met with Microsoft, White moved his office to Denver to finalize negotiations for the joint venture between Microsoft and FDC to establish an e-commerce bill presentment and payment business,  *Id.* at 1347:2-8 and 1394:8-21.

Buoniconti "heard about" the "joint service" with Microsoft at least by 1997. 2005-2006 Hearing Tr., *supra* at 777:23-25. He also understood the FDC/Microsoft goal of doing "electronic billing." *Id.* at 778:2-4.

The joint venture known as MSFDC was formed in June, 1997. Ex. 173. White's signature appears on one of the formation-related agreements as co-president of MSFDC. Ex.174 at 16.  MSFDC later became known as TransPoint. Ex. 226, Duques Tr., *supra* at

96:25 – 97:2. As Duques explained in a press release at the time, "This [joint venture] fits with our strategy to support internet commerce payment transactions and is an exciting opportunity to work with Microsoft." *Id.* 101:5-13.

The joint venture agreement was not just between Microsoft and FDC; it involved and committed their respective affiliates as well. Ex. 173, *supra* at 7. "Affiliates" is defined in the formation agreement to include FDC's wholly owned subsidiaries – such as FDMS. *Id.* at Annex I. For example, as part of the FDC license agreement with MSFDC, FDC warranted that it "… will cause its Affiliates to take all steps necessary for them to grant the rights and undertake the obligations [to MSFDC] imposed on them [by the License Agreement]." Ex. 174, *supra* at 15. The necessity for affiliate/subsidiary participation is explained by the fact that FDC "… did not have its own separate business aside from its subsidiaries." 2013 Hearing Tr., *supra* at 1294:7-12.

White testified that prior to his August, 1998 departure from FDC/MSFDC, he did not consider credit card payment processing to be a necessary component of this new e-commerce business. *Id.* at 1364:14-20. But White acknowledged that (according to CheckFree's November 14, 2000 Form 10Q filed with the SEC) such a credit card payment processing component apparently was under development after White's departure, but before MSFDC/TransPoint was sold to CheckFree in September, 2000. 2013 Hearing Tr., *supra* at 1365:2 - 1366:15.

Duques explained that credit card payment processing, although not a primary element of the TransPoint program, was necessary for those customers who did not want a direct ACH debit, but instead wanted to pay through their credit card in order to "[get] points or something else." Ex. 226, Duques Tr., *supra* at 162:14 - 163:9. While FDC obtained a 50% membership interest in MSFDC, there was no evidence that FDC's

15

affiliates received any independent consideration in return for the contractual obligations they undertook to MSFDC/TransPoint.  *See, e.g.,* Ex. 173, *supra.*

**The Knight-Ridder Contract**

Following execution of the Marketing Agreement, GSI continued its marketing efforts with the other Tier One Companies.  It appears that GSI marketed to most, if not all, of the Tier One Companies and it is undisputed that GSI secured a contract with at least one additional Tier One Company, Knight-Ridder, that resulted in some processing. 2005-2006 Hearing Tr., *supra* at 165:1-2.  In compliance with the Marketing Agreement, GSI thereafter sent notice of a customer commencement date to FDMS (Ex. 30), but no fee was ever paid to GSI as a result of the Knight-Ridder contract.  Fielding testified that this was because, according to his calculations, the account did not generate sufficient processing to justify a fee to GSI under the Marketing Agreement.  2005-2006 Hearing Tr., *supra* at 488:2-12.

**The Expedia Contract**

Microsoft initially owned 100% of Expedia's travel services business.  *See* Ex. 295 at 9.  As a result, any processing required for the Expedia travel business necessarily would have been performed under the first Microsoft contract.  *See* Ex. 1 at National Bankcard Agreement, 1-24.

In 1999, Microsoft spun-off Expedia, but retained ownership of the company.  Ex. 295, *supra.*  After the spin-off, Expedia continued using FDMS's processing services through a verbal arrangement with FDMS/CMS because FDMS/CMS already "…knew who they were."  2013 Hearing Tr., *supra* at 1710:1-5.  A written contract with Expedia was not executed until 2001.  Ex. 170.  In February, 2002 Microsoft divested its interest in Expedia. *See* Ex. 212 at 5.

**The Bank Alliances**

      Adopting FDC's Merchant Bank Alliance Program model, FDMS proceeded to form Bank alliances to indirectly market FDMS processing services to the same merchants to whom FDMS was already marketing, including the Tier One Companies. *See, e.g.,* Ex. 26 Duques Tr., *supra* at 130:1-18 and 2013 Hearing Tr., *supra* at 1615:20-24. The first of these post-merger alliances was formed with Chase Merchant Services, LLC ("CMS"). *See* Ex.144. Upon completing negotiations, the alliance agreement was signed and became effective in December, 1996. *See id.* Much of FDMS's sales force was shifted to CMS. 2013 Hearing Tr., *supra* at 1748:19-25. The majority of FDMS's merchant accounts, including those with Microsoft, were assigned to CMS (*See* Ex. 144; 2013 Hearing Tr., *supra* at 1747:22 – 1748:14; 2005-2006 Hearing Tr., *supra* at 669:16 - 670:13). The processing remained with FDMS. 2005-2006 Hearing Tr., *supra* at 568:8-10 and 582: 22-25.

      FDMS has stipulated that, notwithstanding such assignment (and any other assignment of a Tier One Company Customer contract from NaBANCO/FDMS to CMS), FDMS would remain liable to GSI for fees in connection with any processing performed by NaBANCO/FDMS for such Tier One Company Customer, at least through the initial term of the processing contract. *Id.* at 209:5 - 210:12.

**The Sale to CheckFree**

      MSFDC/TransPoint was sold to CheckFree in September, 2000. *See* Ex. 296 at 4. This sale included a transition services agreement ("TSA") obligating the Joint Venture partners and their respective affiliates to continue to provide certain services to CheckFree for a one year transition period. Ex. 187 at 5.

It appears that MSFDC/TransPoint did no card processing prior to the sale to CheckFree (2013 Hearing Tr., *supra* at 1963:13-20), but MSFDC/TransPoint was an e-commerce related business that had or was developing a credit card processing component. *See id.* at 1365:21 - 1366:15 and Ex. 226, Duques Tr., *supra* at 162:14 - 163:9.

FDC received 6.6 million shares of restricted CheckFree stock from the sale. *See* 2013 Hearing Tr., *supra* at 1885:11-23 and Ex. 296, *supra* at 22. According to FDC's December 31, 2000 Form 10K filed with the SEC, the gross pre-tax gain from receipt of this stock was recognized at $186 million. Ex. 296, *supra* at 22.

However, FDC's vice-president of accounting testified that, because the CheckFree stock could not readily be sold and because FDC guaranteed approximately $60 million in revenue to CheckFree, actual net profit could not be determined for several years following the sale. 2013 Hearing Tr., *supra* at 1885:18 - 1886:18, 1888:5-14. Ultimately, in 2005, after all the stock had been sold and the guaranteed payments determined, FDC realized a net pretax gain of approximately $34 million from the joint venture sale. *See* 2013 Hearing Tr., *supra,* at 1887:12-18, 1908:6 - 1909:8, and *see also* Ex. 301 at 49 and Ex. 302 at 45.

**The Fielding File**

Fielding maintained a file to document the GSI fee calculations. *See* Ex. 113. The determination of appropriate sources to obtain the necessary information and the scope and detail of such record maintenance largely was left to Fielding. In practice, Fielding required verbal communication with account representatives as part of his calculation of fees due GSI; he determined which written documents were required and he decided which documents would be retained for his file. *See, e.g.,* 2005-2006 Hearing

Tr., *supra.* at 477:18 – 478:5, 488:20 -22, 491:4-9, 492:11 - 493:11, 494:24 - 495:17, 496:8-10, 503: 5- 23, 504:5-22, 505:11-20, 513:1-24, 514: 8-11, 593:23 - 594:3, 1393:18 – 1394:10, 1416:1-20, 1420:11-15, 1460:3-16, 1473:6-19 and 1476:8-21.  It appears that Fielding believed complete and accurate record maintenance regarding fees due GSI was only required upon receipt of a customer commencement date letter from GSI.  *Id.* at 495:10-17 and 514:12-17.

Not only was Fielding's file incomplete (*see, e.g., id.* at 495:18 – 496:7, 514:11- 23, 592:21 – 593:2, 1411:18-24, 1436:8-17, 1439:11-19 and 1445:5-19, ), he did not maintain accurate records of fees due GSI under the Marketing Agreement and failed to give GSI proper credit for fees due from the first Microsoft contract. *See, e.g.,* 2013 Hearing Tr., *supra* at 1941:2 - 1942:3, 1950:6-23 and 2258:8-16.  He also did not maintain a definitive record in respect of GSI's commencement date for fees under the first Microsoft contract.  *See, e.g.,* 2005-2006 Hearing Tr., *supra* at 526:6-21.

Aside from speaking with an FDMS/CMS account representative, neither Fielding nor FDMS had any mechanism in place to properly distinguish Traditional NaBANCO Processing Service from New NaBANCO Service.  2013 Hearing Tr., *supra* at 1935:23 - 1937:20.  The merchant contracts themselves were indistinguishable.  2005-2006 Hearing Tr., *supra* at 1109:5-8.

Pursuant to the first Microsoft contract, the initial five-year term did not become effective until "…implementation of the described services…." Ex. 1, *supra* at 10.  As previously noted, GSI's customer commencement date letter for the first Microsoft contract specified that fee calculations were to begin twelve months following the launch of the Microsoft Network - which GSI anticipated would commence sometime in the fourth quarter of 1995.  Ex. 50, *supra.*

Fielding testified that Microsoft began processing with NaBANCO in October, 1995.  2005-2006 Hearing Tr., *supra* at 495:11-13.  He acknowledged receiving a memo from Buoniconti directing him to begin fee payments to GSI as of November 1, 1995.  *Id.* at 1423:14 - 1424:12.

However, NaBANCO did not begin calculating GSI fees until January 1, 1996 and finally made payment to GSI for the first quarter of 1996 in June, 1996. Id. at 1478:23 – 1479:7 and *see* Ex. 25.  Fielding testified he understood from Buoniconti that GSI was due fees for 60 months from January 1, 1996 (2005-2006 Hearing Tr., *supra* at 524:4-18); that is, through December 31, 2000.  *Id.* at 525:23-25.  But if Fielding was instructed that GSI's fees for Microsoft processing were to commence as of November 1, 1995 then GSI's fee payments under the first Microsoft contract would have terminated before November 2000.

FDMS first maintained that the initial five-year term of the first Microsoft contract terminated in June, 2000.  FDMS's Answer and Affirmative Defenses to Second More Definite Statement ("Affirmative Defenses"), Affirmative Defense 1, at 3.  Presently, FDMS maintains that the "effective date [of the initial five-year term of the Microsoft contract] was January, 1995 and the initial term expired December 31, 1999." Respondent FDMS's Written Summation at 13.

In further support of its most recent position, FDMS offered the testimony of former NaBANCO employee Lorraine O'Brian to establish that Microsoft "went live" on January 17, 1995.  2013 Hearing Tr., *supra* at 16-20.  However, if this was the beginning of the initial term of the first Microsoft contract, it would have terminated (along with any fees due GSI) in January, 2000.

Although the Microsoft Amendment was signed in 1999, it did not become effective until June, 2000 and was to run until June, 2002. Ex. 4. June, 2000 is six months after the date that FDMS now claims the initial term of first Microsoft contract terminated; thus, the Microsoft Amendment to the first Microsoft contract would not have become effective until mid-way through the first automatic one-year renewal period provided in the first Microsoft contract. *See* Ex. 1, *supra* at 3.

Because no definitive record regarding inception of this initial five-year term was maintained by Fielding, in-house counsel became involved over the internal confusion regarding the appropriate period of GSI's fee entitlement in respect of the initial term of the Microsoft contract. 2005-2006 Hearing Tr., *supra* at 525:6-14. Fielding was informed that GSI only should have been paid for 48 months. *Id.* at 526:11-16. Fielding was directed to cease further payments to GSI beyond June, 2000 (*id.*) - which constituted 54 months of payments from January, 1996. *Id.* at 523:16-20.

The Panel has determined that GSI's fees for Microsoft processing are to be determined from January 1, 1996; and that is the date on which the initial five-year term of the first Microsoft contract began. Thus, the initial term would have terminated by December 31, 2000. However, the Microsoft Amendment extended the term of the first Microsoft contract through June 30, 2002.

Although FDMS stipulated to GSI's right to fees for any processing business associated with Tier One Customer contract assignments to CMS, Fielding did not produce any records from his GSI file to accurately establish whether such fees were due GSI, and GSI received no fees from any such assigned contract other than for Microsoft. Fielding also was unaware of GSI's customer commencement date letter regarding the Knight-Ridder contract. 2005-2006 Hearing Tr., *supra* at 496:2-7.

Given the relatively short exclusivity period afforded GSI, the Panel finds that all thirty-four Tier One Companies necessarily were GSI-related.  Fielding's file did not track FDMS business for all of these companies.  His file also failed to contain documentation specifying whether such business was Traditional NaBANCO Processing Service, New NaBANCO Service, or other related New NaBANCO Service (*i.e.* incremental business).  The only way Fielding could make such a judgment was to seek out the appropriate relationship manager at the time to determine whether "…anything that was new had been added [and] what the nature of it was." *Id.* at 491:1-3.

To make up for this deficiency, FDMS offered its Multi-Platform Reporting System Database ("MPRS").  While much of the information Fielding failed to appreciate or should have utilized was captured by the MPRS database, it failed to distinguish between Traditional NaBANCO Processing Service and New NaBANCO Service.  It included processing data from the North and South platforms (2013 Hearing Tr., *supra* at 1802:5-16), but failed to capture any processing data from the Omaha or other processing platforms (*id.* at 1803:1-8), and was no substitute for the requirement that accurate and complete records of all GSI-related transactions be properly maintained in a reasonably auditable fashion as required by the Marketing Agreement.

## CONCLUSIONS OF LAW

Florida requires proof by a preponderance of evidence in a civil case. *See, e.g., Westerheide v. State*, 888 So.2d 702 (Fla. 5 DCA 2004).  Such proof is more qualitative than quantitative. *See, e.g., Saporito v. Bone,* 195 So.2d 244 (Fla. 2 DCA 1967).  It "…necessarily implies that the evidence must 'satisfy the mind of the jury' such as to 'lead a reasonably cautious man to that conclusion'; 'produce a reasonable belief' and 'convince as of the truth.' [citations omitted]". *Id.* at 245.

The burden of proof, of course, ultimately rests with the claimant. As noted by the court in *Westerheide*:

> In *In re Ziy's Estate*, 223 So.2d 42 (Fla.1969)(quoting *Alabama Great So. R. Co. v. Hill*, 34 Ala. App. 466, 43 So.2d 136, 137 (1949), our supreme court explained the burden of proof in civil cases as follows:
>
>> The term "burden of proof" has two distinct meanings. By the one is meant the duty of establishing the truth of a given proposition or issue by such a quantum of evidence as the law demands in the case in which the issue arises; by the other is meant the duty of producing evidence at the beginning or at any subsequent stage of the trial, in order to make or meet a prima facie case. Generally speaking, the burden of proof, in the sense of producing evidence, passes from party to party as the case progresses, while the burden of proof, meaning the obligation to establish the truth of the claim by a preponderance of evidence, rests throughout upon the party asserting the affirmative of the issue, and unless he meets this obligation upon the whole case he fails.
>> *Id.* at 43.

*Westerhide,* 888 So.2d, *supra* at 705.

With this standard in mind, the Panel turns to the resolution of GSI's remaining claims, including damages.

### GSI is Due Fees for Tier One Companies Other than Microsoft

GSI had exclusive marketing rights to the Tier One Companies for New NaBANCO Service, but not for Traditional NaBANCO Processing Service. Notwithstanding Respondent's obligation to maintain complete and accurate records, it failed to establish any reasonabe mechanism for determining whether a Tier One company other than Microsoft was availing itself of New NaBANCO Service or Traditional NaBANCO Processing Service. This failure was exacerbated by the change in FDMS's fundamental business model change following the merger.

GSI had a right to rely on FDMS's continuation of its business model when entering into the Marketing Agreement. *Cf. Western Oil & Fuel Company v. Kemp*, 245 F.2d 633, 638 (8 Cir. 1957) (requirements contracts made between business men pre-suppose continuance of well-established business). While FDMS had a right to change its business model, it had a duty to GSI under the Marketing Agreement, at least during the exclusivity period, to integrate GSI Services into its new alliance model and maintain complete and accurate records of all GSI-related transactions – including FDMS alliance transactions with the Tier One Companies.

With the exception of any transactions that may have been processed on platforms other than the North and South platforms, the MPRS database appears to have captured all of the processing performed by FDMS for the Tier One Companies, both directly and through its bank alliances. 2013 Hearing Tr., *supra* at 1974:9-14. Monies due GSI stemming from this processing were calculated by FDMS's expert, Elkin, using an eight year contract term assumption. *Id.* at 1966: 1-16. Utilizing the MPRS database, Elkin concluded that the amount remaining due GSI, including any amount due; (i) under the Knight-Ridder contract, and (ii) under bank alliance related accounts with Tier One Company merchants processed on the North or South platforms (less amounts likely contributed by FDMS to the alliances to compensate for bank merchant contract contributions or required revenue sharing), was approximately $161,425.00. *See, e.g., id.* at 1288:16 – 1290:19, 1563:15 – 1564:7, 1539:12-24, 2149:7-18, 2150:10-21 and Ex. 356. The Panel adopts this conclusion.

### GSI is Entitled to Additional Fees for the First Microsoft Contract

Although GSI received fees from NaBANCO/FDMS relating to the first Microsoft contract, it was not paid all of the fees to which it was entitled. Not only were

the Microsoft related fees from FDMS to GSI terminated prematurely, Elkin testified that the Microsoft related fees that were paid to GSI were not properly computed by NaBANCO/FDMS.  2013 Hearing Tr., *supra* at 1950:3-23.  GSI was not credited with all of the Microsoft processing.  *Id.*  Nor was GSI given fees for any of the $50,000 minimum monthly payments from Microsoft to FDMS. *Id.*

The Panel finds the meaning of the word "term" within the Microsoft Amendment is ambiguous for purposes of determining GSI fees and should be construed against the drafter, FDMS.  *See, e.g., City of Homestead v. Johnson,* 760 So.2d 80, 84, (Fla. 2000).  The Panel finds that GSI is entitled to fees under the first Microsoft contract through June, 2002.  Utilizing the MPRS, the remaining fee due GSI, through June 30, 2002 (excluding any processing on the Omaha platform), is  $291,442.00.

### GSI is Entitled to Fees for Expedia Processing

Microsoft continued its ownership of Expedia immediately following the 1999 spin-off.  Because of the Microsoft relationship, processing for Expedia was performed by FDMS until 2001 without a written contract.  The Panel finds this was a continuation of the Microsoft processing for purposes of fees due to GSI, at least until January 1, 2001 when Expedia began processing pursuant to a written contract with FDMS/CMS.

Utilizing the MPRS database, and a rule of thumb for computing GSI fees based upon net sales figures volume, the Panel finds the remaining amount due GSI for Expedia processing through January 1, 2001 (exclusive of any Omaha platform processing), is approximately $3,700.00.

### GSI is Entitled to Incremental Business Fees for MSFDC/TransPoint

The Panel finds that the MSFDC/TransPoint joint venture ("Joint Venture") between Microsoft and FDC qualifies as incremental business under the Marketing

Agreement. The Microsoft relationship established by NaBANCO/GSI opened the door for FDC to pursue the Joint Venture. Moreover, GSI was requested to provide NaBANCO with a report on CheckFree (the ultimate purchaser of the Joint Venture business), but was excluded from any involvement in the Joint Venture discussions - even during the exclusivity period.

MSFDC/TransPoint satisfies the requirements of the Marketing Agreement for incremental business. Microsoft was an existing "Customer" of NaBANCO. Microsoft was a party to, and thus included within, the Joint Venture. The Joint Venture obtained a contractual commitment from NaBANCO/FDMS through its parent, FDC, to assist the Joint Venture as required - including potential development and integration of an e-commerce card processing component. NaBANCO recognized the relationship of this business to New NaBANCO Service by using GSI to prepare a report on CheckFree. The joint development of this e-commerce bill presentment and processing business was not previously contracted for by either Microsoft or NaBANCO/FDMS. It was "distinct and apart" from the first Microsoft processing contract.

The Panel finds that FDMS was not compensated by FDC, Microsoft or the Joint Venture for its contractual commitments to the Joint Venture. Although no profits were generated by the Joint Venture until the business was sold to CheckFree in 2000, FDC ultimately realized a $34 million net profit from this sale.

The Marketing Agreement does not provide a specific formula for an incremental business fee determination. Indeed, as the e-commerce business was evolving, the Marketing Agreement contemplates that incremental business would be, as here, "...distinct and apart from that previously contracted for by the Customer..." Ex.1, *supra* at 4. Thus, the Marketing Agreement's fee formula based upon processing is not entirely

applicable.  Nevertheless, it is a useful tool in calculating damages based upon net profit realized from the sale of a Joint Venture business because the processing fee formula is predicated upon a calculation of net profit.

If GSI had been included in the Joint Venture discussions, the Panel finds that it would have issued a customer commencement date letter for this incremental business within twelve months from the June, 1997 Joint Venture agreement.  Because the Joint Venture was experiencing investment losses at the time of its formation, the Panel finds that such a customer commencement date logically would have been declared to begin in May, 1998.  No fee would be due until and unless the Joint Venture achieved a gross profit from which the net profit could be determined.

A $186 million gross pre-tax gain was recognized by FDC following the 2000 sale of the Joint Venture to CheckFree.   However, because the CheckFree stock received by FDC in consideration for the sale was restricted, and because FDC remained obligated to CheckFree on a $60 million revenue guarantee, FDC's net profit could not be determined for more than thirty-six months from the customer commencement date.

No evidence was presented to establish that FDC shared its net profit from the Joint Venture sale with any of its affiliates.  Thus, FDMS's allocable share of this net profit cannot be determined with precision.  However, according to Buoniconti, GSI would be entitled to "something" if FDC received the benefit of GSI Services.  Thus, the Panel applied the Marketing Agreement's applicable share formula to the net profits received by FDC from the sale of the Joint Venture for purposes of calculating damages sustained by GSI.

Net profits realized after thirty-six months are subject to a 3% applicable share under the Marketing Agreement formula.  Applying this 3% from the Marketing

Agreement for net profits realized after thirty-six months entitles GSI to a fee of 3% x $34 million net profit, or $1,020,000.00. *See* Ex. 1, *id.* at National Bankcard Agreement, 3.

### FDMS's Affirmative Defenses Do Not Preclude GSI's Claims

FDMS raised twenty-two affirmative defenses. Affirmative Defenses, *supra* at 2-6. FDMS's affirmative defenses do not alter the Panel's conclusions.

As subsumed within the Panel's Findings and Conclusions above, the Panel rejects FDM's affirmative defenses 1, 4, 5, 6, 8, 9, 11, 16 and 21, and finds that affirmative defenses 2, 7, 10, 14, 19, 20, and 22 are moot.

The Panel rejects affirmative defense number 3 and finds that, in light of this lengthy arbitration and failed mediation, settlement negotiations likely would not have been fruitful.

The Panel rules that Florida applies and that the prevailing party is entitled to attorney's fees as indicated in affirmative defenses 12 and 13 respectively, such fees to be determined by the Panel .

The Panel rejects affirmative defense number 15. The Panel finds that FDMS did not meet its burden of establishing each of the necessary elements attendant to this affirmative defense(s).

Given FDMS's breach of the Marketing Agreement by failing to maintain complete and accurate records of GSI related transactions, the Panel rejects affirmative defense number 17 insofar as it may pertain to the claims for which an award is made to GSI. The panel rejects affirmative defense number 18 for lack of sufficient proof.

**FURTHER PROCEEDINGS**

Within thirty days from the date of these Findings and Conclusions the parties shall submit motions for the matters reserved in their respective written summations which they wish the Panel to consider, including the remaining issues of prejudgment interest, attorneys' fees, costs, and an Award in the form of a proposed final judgment(s).

DONE AND ORDERED this 11th day of December, 2013.

_____
Hon. Herbert Stettin, Arbitrator
For the Panel

cc:   Nathaniel H. Akerman, Esq.
      Spencer H. Silverglate, Esq.
      John W. Peterson, Esq.
      John R. Jacobson, Esq.
      Milton S. McGee, Esq.
      Paris Earp, AAA Case Manager
      Paul J. McMahon, Esq., Arbitrator
      Mark F. Raymond, Esq., Arbitrator